[Cite as *State v. K.L.Q.*, 2026-Ohio-2491.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                                    :

    Plaintiff-Appellee,                          :

                                     No. 24AP-342

v.                                                               :            (C.P.C. No. 23CR-3172)

[K.L.Q.],                                                        :            (REGULAR CALENDAR)

    Defendant-Appellant.                         :

D E C I S I O N

Rendered on June 30, 2026

**On brief:** *Shalya D. Favor*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Jeffrey D. Devereaux.*

**On brief:** *Mitchell A. Williams*, Public Defender, and *Leon J. Sinoff*, for appellant. **Argued:** *Leon J. Sinoff.*

APPEAL from the Franklin County Court of Common Pleas

BOGGS, P.J.

{¶ 1} Defendant-appellant, [K.L.Q.], appeals his convictions in the Franklin County Court of Common Pleas for discharging a firearm on or near prohibited premises, felonious assault, failure to comply with the order or signal of a police officer, and having weapons while under a disability, along with various specifications. For the following reasons, we reverse the trial court's judgment and remand this matter to the trial court for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} On May 25, 2022, city of Columbus police officers inside substation 13 on East Woodrow Avenue heard gunshots. Officer Michael Neal looked out the substation window and observed a male, later identified as [K.L.Q.], driving a dark sedan and firing a gun out the driver's door toward the substation. The sedan proceeded eastbound past the substation a couple hundred yards before turning around and passing the substation in the

opposite direction. Officers exited the substation and pursued the sedan in their cruisers. Meanwhile, Charles Gregory was stopped at a stop sign at the intersection of East Woodrow Avenue and Ann Street when [K.L.Q.] fired a shot, which struck the hood of Gregory's car and went through his dashboard. After a short chase by the police, [K.L.Q.] brought his vehicle to a stop, exited the vehicle through the driver's window with his hands up, and lay on the ground, where officers handcuffed and arrested him without resistance. Officers found a revolver with five spent shell casings in the front passenger seat of the sedan.

{¶ 3} Police officers Anthony Sebastiano and Michael Neal described [K.L.Q.]'s behavior at the time of his arrest as "erratic." (Mar. 12, 2024 Tr. Vol. 2 at 289; Vol. 3 at 402.) Officer Sebastiano testified that [K.L.Q.] was "saying things that didn't make sense," "appeared to be talking to people [who] weren't there," and was "saying some stuff that wasn't in line with somebody [who] was completely there mentally." *Id.* at 289. Officer Sebastiano recognized a possible mental-health issue. He reported, [K.L.Q.] said "something to the effect of 'they killed my whole family.' " *Id.* at 297. As officers loaded [K.L.Q.] into the police van, [K.L.Q.] was looking past the officers and talking about "them back there," who had either killed his family or were out to get him, but Officer Eric Everhart did not see anyone to whom [K.L.Q.] could have been referring. *Id.* at 462. [K.L.Q.] was insistent that officers close the door to the police van, because it was "not just officers out there." *Id.* at 463. [K.L.Q.] also asked officers to check on people he feared had been killed, but police found those people to be unharmed. A video recording of [K.L.Q.] in the back of the police van shows [K.L.Q.] insisting that people were following the van and asking officers to take down the license plates of the pursuers. Officer Neal, who was driving the police van, did not see anyone following him. According to Officer Neal, it seemed like [K.L.Q.] "was not in the moment, . . . like he was a little out of it still." *Id.* at 431.

{¶ 4} [K.L.Q.] denied being under the influence of any substance. Officers did not conduct field sobriety tests on [K.L.Q.] or order toxicology testing. A search of [K.L.Q.]'s car uncovered no drugs or drug paraphernalia.

{¶ 5} The Franklin County Grand Jury returned an indictment charging [K.L.Q.] with seven criminal counts, all but one of which carried specifications. After initially pleading not guilty, [K.L.Q.] later entered an amended plea of not guilty by reason of insanity ("NGRI"). "A person is not guilty by reason of insanity only if the person proves

that 'at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.' " *State v. Grate*, 2020-Ohio-5584, ¶ 76, quoting R.C. 2901.01(A)(14). NGRI is an affirmative defense that a defendant must prove by a preponderance of the evidence. *Id.*

{¶ 6} The matter proceeded to a jury trial on March 11, 2024.

{¶ 7} In support of his NGRI defense, [K.L.Q.] presented the expert testimony of John Tilley, Psy.D., and on rebuttal, the state presented expert testimony from E.E. White, Psy.D. Both Dr. Tilley and Dr. White had previously produced written expert reports containing their opinions and conclusions, which the parties had exchanged, pursuant to Crim.R. 16. To the extent it provides necessary context for our discussion of the relevant trial court ruling and [K.L.Q.]'s appellate arguments, we briefly review the doctors' written reports here.

### A. Written expert reports

{¶ 8} Dr. White issued her original written report concerning [K.L.Q.]'s NGRI defense on September 29, 2022. She stated:

> The evidence is equivocal about whether the defendant has a severe mental disease, the precise identification of which is complicated by his personality characteristics and a history of substance use that can exacerbate or induce mood-related and/or psychotic-like symptoms. Despite the defendant's recent involvement in a physical altercation with another inmate resulting in a noticeable physical head injury on his forehead, there is no indication that he has a severe mental defect.

(State's Ex. H at 2.) As to whether [K.L.Q.] was aware of the wrongfulness of his acts at the time of the charged offenses, Dr. White wrote, "There are factors weighing on both sides of the issue, but the weight of the evidence indicates that he did know the wrongfulness of the acts charged." *Id.* at 6. She concluded, "Based on the available information, it is my opinion that, at the time of the alleged offense[s], the defendant was not experiencing symptoms of a severe mental disease or defect that resulted in him not knowing the wrongfulness of the acts charged." (Emphasis omitted.) *Id.* at 1.

{¶ 9} Dr. Tilley, on the other hand, concluded in his initial report that [K.L.Q.] "was symptomatic with a severe mental disease or defect at the time of the events in question." (Def.'s Ex. 1-A at 17.) Other than with respect to the charge of having a weapon while under

a disability, Dr. Tilley opined that [K.L.Q.] "did not know the wrongfulness of" the acts charged, "because of his severe mental disease or defect." (Emphasis omitted.) *Id.* at 18. From [K.L.Q.]'s prior medical records, Dr. Tilley noted that [K.L.Q.] had previously been diagnosed with conditions such as schizophrenia, schizoaffective disorder, and bipolar disorder, all conditions of serious mental illness. While acknowledging [K.L.Q.]'s struggles with substance use as established by his prior medical records, Dr. Tilley noted [K.L.Q.]'s account that he had not consumed alcohol for a few days prior to the events in question and his denial of using other substances around that time.

{¶ 10} In his recap of his interview with [K.L.Q.], Dr. Tilley mentioned [K.L.Q.]'s report that, in the hours preceding the charged offenses, "he developed delusional beliefs that his mother had been kidnapped, that his stepfather had been murdered, and that he was targeted for assassination." *Id.* at 15. [K.L.Q.] reported experiencing both auditory and visual hallucinations, consistent in quality and content to hallucinations he had experienced in the past. *Id.* at 13. Dr. Tilley stated that [K.L.Q.]'s reported psychiatric decompensation and symptomatology on the day in question, when he had not taken his prescribed mental-health medications for about three days, was consistent with [K.L.Q.]'s previous clinical presentations, as set out in his prior medical records. [K.L.Q.] continued to experience auditory hallucinations and visible disturbances in the days after his arrest. Dr. Tilley stated, "several months of pharmacotherapy," including Risperdal, an antipsychotic medication, "were needed to achieve the psychiatric stability" [K.L.Q.] exhibited during his interview with Dr. Tilley in March 2023. *Id.* at 17.

{¶ 11} In September 2023, the parties requested that Dr. White and Dr. Tilley review video footage of [K.L.Q.] in the back of the police van immediately after his arrest to determine whether it affected their opinions. Both experts reviewed the footage and issued supplemental reports, but their opinions remained unchanged. Dr. White acknowledged that [K.L.Q.] "appears in distress," "presents as hypervigilant," "expresses paranoia," and "appears to be responding to perceptual disturbances . . . and reporting possible delusional beliefs," but she maintained that "the evidence is equivocal about whether [he] has a severe mental disease." (State's Ex. H-2 at 1, 3.) Although she had no opinion whether [K.L.Q.] was using illicit substances at the time of the charged offenses, she stated, "I cannot rule out that the etiology of his psychotic symptoms (e.g., paranoia, auditory/visual

hallucinations, delusional beliefs, hypervigilance) did not derive from voluntary substance intoxication given his extensive substance abuse history of alcohol and drugs . . . that can potentially induce similar symptoms." *Id*. at 3. Dr. Tilley remained steadfast in his original opinion and stated that the data, supported by the video footage, aligned with his opinion that [K.L.Q.] "did not know the wrongfulness of the acts charged because of his severe mental disease or defect." (Def.'s Ex. 2 at 5.)

{¶ 12} Dr. White produced another supplemental letter after reviewing additional video footage of an interview of [K.L.Q.] by a detective, but she again stated, "There remains insufficient evidence to conclude that the defendant's psychotic symptoms stemmed from a severe mental disease rather than [from] acute intoxication." (State's Ex. H-3 at 2.) She explained, "Considering the defendant's history of mental health issues in conjunction with substance abuse, substance-induced psychosis cannot be ruled out." *Id*.

### B. Expert trial testimony and the trial court's evidentiary ruling

{¶ 13} After the state rested its case-in-chief at trial, the defense called Dr. Tilley as its sole witness to establish [K.L.Q.]'s affirmative defense of NGRI. Dr. Tilley testified about his evaluation of [K.L.Q.], the materials he reviewed and relied on in formulating his expert opinion, and his original and supplemental written reports. The state objected, however, when defense counsel asked Dr. Tilley, "what is your opinion regarding substance use disorder within this evidence that you're seeing here now?" (Tr. at 594-595.) The state argued that, under Crim.R. 16(K) and *State v. Boaston*, 2020-Ohio-1061, the trial court must preclude Dr. Tilley from offering an opinion regarding substance use, as no such opinion was included in his written reports. The prosecutor argued, "Any reference to Dr. Tilley making an opinion on anything about substance use is objectionable under *Boaston* and [Crim.R.] 16(K) because he had every opportunity to do so in two reports [but] didn't." (Tr. at 598.) He went on: "This is a necessary and critical and material opinion that he's trying to opine on without noticing the State," and "the State shouldn't have to be blindsided by this information, because we would have taken it to our own expert to be prepared." *Id*.

{¶ 14} After hearing arguments from both parties, the trial court sustained the state's objection, because in his written report "Dr. Tilley does not offer any opinions with respect to substance use disorder and how that may or may not have been a cause or a reason for the behaviors of [K.L.Q.]." *Id*. at 602. The trial court acknowledged, "we can . .

. reasonably conclude that [Dr. Tilley], while aware of [K.L.Q.]'s prior substance use, felt that it didn't impact" his expert opinion. *Id.* at 607. Yet the trial court held that Dr. Tilley could not testify as to "why he did not consider substance use disorder" in reaching his opinion that [K.L.Q.] was not guilty by reason of insanity. *Id.* at 603.

{¶ 15} Defense counsel orally moved the trial court to reconsider its ruling and argued that, by "rendering an opinion with respect to mental health," Dr. Tilley "is, by implication, excluding drugs or alcohol, substance abuse disorder" as the cause of [K.L.Q.]'s conduct. However, the trial court denied the motion for reconsideration and maintained its prior evidentiary ruling:

> Having that information available to him at the time that he was preparing his report, [Dr. Tilley] still did not include in his report an opinion on how substance use or substance abuse did not --was not part of his consideration in determining that the defendant was not guilty by reason of insanity. Clearly, his report relied solely upon, as he testified to, the hallucinations, the psychotic behavior, the paranoia. The Court is still of the opinion for him to come in and now offer a second opinion that was not offered at all previously would be improper.

*Id.* at 659-660.

{¶ 16} In the state's rebuttal case, Dr. White offered expert opinion testimony consistent with her written reports that, at the time of the alleged offenses, [K.L.Q.] "was not experiencing symptoms of a severe mental disease or defect that resulted in him not knowing the wrongfulness of the acts charged." *Id.* at 750. She explained that symptoms of substance use can mimic symptoms of schizophrenia, bipolar disorder, or psychosis in general, making it "challenging to decipher if [K.L.Q.]'s symptoms came from a genuine mental illness or [were] induced by a substance." *Id.* at 761. On cross-examination, however, Dr. White acknowledged she did not have an opinion about whether [K.L.Q.] was on substances at the time of the alleged offenses and had no information to support an opinion that he was on substances at that time.

### C. The verdict and sentencing

{¶ 17} The jury found [K.L.Q.] not guilty of Count 1—felonious assault in violation of R.C. 2903.11—but guilty of Count 2—discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162, a first-degree felony, with a three-year firearm specification; Count 3—felonious assault in violation of R.C. 2903.11, a second-degree

felony, with a three-year firearm specification and a five-year drive-by-shooting specification; Count 4—discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162, a third-degree felony, with a three-year firearm specification; and Count 5—failure to comply with the order or signal of a police officer in violation of R.C. 2921.331, a third-degree felony, with a one-year firearm specification. As to the remaining charges, for which [K.L.Q.] had waived his right to a jury trial, the trial court found him guilty of Count 6—failure to comply with the order or signal of a police officer in violation of R.C. 2921.331, a fourth-degree felony, with a one-year firearm specification—and Count 7— having weapons while under a disability in violation of R.C. 2923.13, a third-degree felony.

{¶ 18} After merging appropriate offenses, the trial court imposed sentences that amounted to an aggregate total minimum sentence of 19 years up to a potential maximum sentence of 21 and one-half years in the custody of the Ohio Department of Rehabilitation and Correction. [K.L.Q.] appealed.

## II. ASSIGNMENTS OF ERROR

{¶ 19} [K.L.Q.] raises two assignments of error for this court's review:

> **First Assignment of Error:** The Trial Court's Complete Preclusion of the Defense Expert Witness's Opportunity to Address the State's Expert Witness's Speculation that Appellant was not Insane but was Instead Acutely Intoxicated – the Central Issue at Crux of the Trial – Denied Appellant His Constitutional Right to a Meaningful Opportunity to Present a Complete Defense.

> **Second Assignment of Error:** The Manifest Weight of the Evidence Demonstrated that Appellant was Legally Insane at the Time of the Offense, and the State Introduced No Competent or Credible Evidence to Rebut that Conclusion.

(Appellant's Brief at i-ii.)

## III. DISCUSSION

### A. First assignment of error

{¶ 20} In his first assignment of error, [K.L.Q.] challenges the trial court's evidentiary ruling precluding Dr. Tilley from addressing substance abuse. Defense counsel preemptively sought Dr. Tilley's response to Dr. White's opinion in her written reports that, despite the absence of any evidence that [K.L.Q.] had engaged in substance use around the

time of the charged offenses, [K.L.Q.]'s visible psychotic symptoms may have stemmed from intoxication and not from a severe mental disease. [K.L.Q.] maintains that, by sustaining the state's objection to this testimony, the trial court erroneously precluded him from eliciting Dr. Tilley's take on a critical issue that Dr. White had introduced into the case and that lay at the crux of his NGRI defense, thus impermissibly tilting the field in favor of the state and denying him his constitutional right to present a complete defense.

{¶ 21} The state premised its objection on *Boaston*, in which the Supreme Court of Ohio construed Crim.R. 16(K) and held, "it is error to admit expert-opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K)." *Boaston*, 2020-Ohio-1061, at ¶ 1. Crim.R. 16, which governs discovery in criminal cases, is intended "to provide all parties . . . with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). Crim.R. 16(K), adopted in 2010, requires expert witnesses to generate written reports and requires timely disclosure of those reports to the opposing party:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

The purpose of Crim.R. 16(K) " ' "is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." ' " *Boaston* at ¶ 48, quoting *State v. Fetty*, 2012-Ohio-6127, ¶ 36 (11th Dist.), quoting *State v. Perry*, 2012-Ohio-4888, ¶ 55 (11th Dist.).

{¶ 22} *Boaston* involved a challenge to a deputy coroner's opinion testimony as to the time of a decedent's death and a comparison between an abrasion on the decedent's

face with a buckle on a glove collected from the defendant. Those opinions were not included in the deputy coroner's written autopsy report. The Supreme Court of Ohio addressed "whether Crim.R. 16(K) required the exclusion of [the deputy coroner's] testimony" on those issues, which "went beyond the scope of her written autopsy report." *Id.* at ¶ 47. The Supreme Court related the significance of the new opinions as follows:

> [T]he time-of-death opinion based on the stomach-content findings is important because it puts [B]'s time of death during a period when Boaston admitted to having been alone with [B] at his residence. Additionally, the glove-buckle comparison provided an explanation for what may have caused the distinct chin abrasion likely inflicted during [B]'s struggle or strangulation.

*Id.* at ¶ 56. The defense learned of the deputy coroner's "substantive opinion testimony" on those issues 19 days before trial and suggested that the deputy coroner file a supplemental report, which could have cured any noncompliance with Crim.R. 16(K), but she did not do so. *Id.* at ¶ 57. The Supreme Court held that the trial court "erred in allowing [the deputy coroner's] opinion testimony that went beyond the scope of the supplied expert report." *Id.* at ¶ 58.

{¶ 23} In *Boaston*, the deputy coroner's written autopsy report, which had been provided to defense counsel more than a year before trial, did not include opinions as to the time of the decedent's death or the abrasion-buckle comparison, and the deputy coroner did not supplement her written report with an addendum addressing those opinions. The deputy coroner's trial testimony did not give rise to unfair surprise, as defense counsel met with the deputy coroner 19 days before trial and learned of her conclusions regarding the time of death and the abrasion-buckle comparison, and there was no suggestion that the deputy coroner's unwritten conclusions affected the defense strategy. Even so, based on the plain language of Crim.R. 16(K), the Supreme Court held that admitting the deputy coroner's expert testimony regarding time of death and the abrasion-buckle comparison violated Crim.R. 16(K), as she did not address those topics in her written report. *Id.* at ¶ 55, 58. But despite determining the trial court had violated Crim.R. 16(K), the Supreme Court affirmed the trial court's judgment based on its further conclusion that the error was harmless under Crim.R. 52, because Boaston was not prejudiced by the admission of the

deputy coroner's testimony and because the remaining evidence overwhelmingly established Boaston's guilt beyond a reasonable doubt.

{¶ 24} Like *Boaston*, this case did not involve a failure to disclose an expert report; both expert witnesses filed initial and supplemental written reports. The state argued at trial that, like in *Boaston*, testimony by Dr. Tilley that went beyond the scope of his written report would violate Crim.R. 16(K). [K.L.Q.], however, argues that the trial court's ruling precluding Dr. Tilley from offering any testimony touching on substance use was an improper application of *Boaston*. We agree with [K.L.Q.]. The trial court's overexpansive interpretation of *Boaston* stretched the holding of that case too far and led the trial court to an erroneous evidentiary ruling that substantially and prejudicially affected [K.L.Q.]'s right to present a complete defense.

{¶ 25} The deputy coroner in *Boaston* offered new substantive expert opinions at trial that were not included in her written reports. She testified as to the decedent's time of death, based on the contents of the decedent's stomach, and as to a match between the defendant's glove buckle and an abrasion on the decedent's face—both issues going to whether the defendant had killed the decedent. These were wholly new opinions that had not been included in any written expert report.

{¶ 26} The trial court's ruling here went far beyond precluding Dr. Tilley from offering new substantive opinion testimony. Dr. Tilley's opinion, as set out in his written report and maintained consistently thereafter, was that [K.L.Q.] "was symptomatic with a severe mental disease or defect at the time of the events in question," based on "[t]he symptomology he was experiencing at the time." (Def.'s Ex. 1-A at 15, 17.) Dr. Tilley's written report, exchanged in compliance with Crim.R. 16(K), summarized his findings, analysis, conclusions, and opinion as required under Crim.R. 16. Defense counsel did not ask Dr. Tilley to inject into his trial testimony a new opinion, only that he respond to Dr. White's contrary suggestion that substance use or intoxication might have given rise to [K.L.Q.]'s psychotic symptoms at the time of his offenses. Such testimony was intended to clarify and provide context for Dr. Tilley's existing opinion, as fully set out in his written report, and to explain why [K.L.Q.]'s history of substance use did not play into that opinion.

{¶ 27} Although the trial court precluded Dr. Tilley from offering any testimony about substance use, purportedly because his written report did not address that question,

Dr. Tilley did acknowledge [K.L.Q.]'s history of substance abuse in his written report.  Dr. Tilley mentioned [K.L.Q.]'s self-reported history of using alcohol, cannabis, methamphetamine, and cocaine, and [K.L.Q.]'s characterization of his methamphetamine and cocaine usage as "particularly problematic."  (Def.'s Ex. 1-A at 3.)  He also noted [K.L.Q.]'s claim that he had not used cannabis or methamphetamine in the past two years and had not used cocaine in the past four years.  [K.L.Q.] told Dr. Tilley that, although he drank occasionally around the time of the charged offenses, he did not drink to the point of intoxication.  [K.L.Q.] reported to Dr. Tilley that he had previously completed an inpatient substance abuse treatment program.   Dr. Tilley noted, [K.L.Q.] "has experienced psychiatric symptomatology in the absence of substance usage."  *Id.* at 4.

**{¶ 28}** In addition to [K.L.Q.]'s own admissions regarding his substance use, Dr. Tilley acknowledged records from Ross Correctional Institution and North Central Mental Health ("NCMH") that indicated [K.L.Q.] had previously been diagnosed with substance abuse disorders.   [K.L.Q.] denied ongoing substance abuse in 2021 when he sought psychiatric and  pharmacological  management services from NCMH, but his diagnoses at the time of his discharge from NCMH in December 2022 did include cocaine abuse. [K.L.Q.]'s ex-girlfriend relayed to Dr. Tilley that [K.L.Q.] used alcohol and cannabis during their relationship, between 2018 and 2021, but she did not know if he did so excessively. Dr. Tilley cited all this evidence in his initial written report as part of the information he relied on to reach his opinion.

**{¶ 29}** Despite  [K.L.Q.]'s  acknowledged  and  otherwise  documented  history  of substance use, Dr. Tilley opined, "All available data converge to indicate that [K.L.Q.] was symptomatic with a severe mental disease or defect before, during, and after the events in question."  *Id.* at 15.  From Dr. Tilley's report, it is readily and reasonably inferable that Dr. Tilley considered [K.L.Q.]'s history of substance use but that it did not impact his ultimate opinion that [K.L.Q.] was suffering from a severe mental disease, giving rise to his psychotic symptoms at the time of the charged offenses.  Defense counsel's request for Dr. Tilley to explain why [K.L.Q.]'s history of substance use did not impact his opinion that [K.L.Q.] was suffering from a severe mental disease at the time of the charged offenses did not call for a new, substantive opinion that is precluded by Crim.R 16(K) or *Boaston*.

{¶ 30} The state's argument to the trial court that it should not be "blindsided" by a new opinion by Dr. Tilley is, in this context, hyperbolic and borders on gamesmanship. (Tr. at 598.) It was the state's expert, Dr. White, who introduced the topic of substance use as a potential catalyst for [K.L.Q.]'s conduct. She stated that a "history of substance use," which both experts recognized in [K.L.Q.], "can exacerbate or induce mood-related and/or psychotic-like symptoms." (State's Ex. H at 2.) After reviewing the video of [K.L.Q.] in the police van, Dr. White acknowledged [K.L.Q.]'s denial of having used substances around the time of the charged offenses and stated, "I do not have an opinion as to whether [K.L.Q.] was or was not using substances at the time of the offense." (State's Ex. H-2 at 3.) Nevertheless, she stated she could not rule out that [K.L.Q.]'s psychotic symptoms derived from voluntary substance use. In her last supplemental letter, Dr. White stated, "There remains insufficient evidence to conclude that [K.L.Q.]'s psychotic symptoms stemmed from a severe mental disease rather than [from] acute intoxication. . . . Considering [K.L.Q.]'s history of mental health issues in conjunction with substance abuse, substance-induced psychosis cannot be ruled out. " (State's Ex. H-3 at 2.)

{¶ 31} Defense counsel's questioning about the effect, or lack of effect, of [K.L.Q.]'s substance use on Dr. Tilley's opinion did not raise the prospect of unfair surprise to the state. Not only did the state's own expert introduce the issue of [K.L.Q.]'s substance use as a potential catalyst for [K.L.Q.]'s conduct, the trial court itself acknowledged that it could "reasonably conclude" from Dr. Tilley's written reports that Dr. Tilley was aware of [K.L.Q.]'s prior substance use but "felt that it didn't impact" his expert opinion. (Mar. 14, 2024 Tr. Vol. 4 at 607.) If the trial court could reasonably conclude from Dr. Tilley's written reports that [K.L.Q.]'s prior substance use did not impact his expert opinion, so too could the state. The state could not reasonably have been surprised, let alone blindsided, that defense counsel would ask Dr. Tilley to explain his disagreement with Dr. White's written opinion regarding the effect of [K.L.Q.]'s prior substance use on his NGRI claim, particularly when it was undisputed that there was no evidence that [K.L.Q.] was under the influence of any substance at the time of the charged offenses. Inasmuch as Dr. Tilley's report contained sufficient information for the trial court to reach its conclusion that Dr. Tilley knew of [K.L.Q.]'s prior substance use, but did not find it impactful to his overall opinion, the report likewise contained sufficient information to permit Dr. Tilley to clarify

or explain that lack of impact as part of his testimony. In other words, there cannot be enough information in Dr. Tilley's report for the trial court to recognize that [K.L.Q.]'s substance use did not have an "impact" on Dr. Tilley's opinion, but simultaneously not enough information so that the state is "blindsided" by testimony that [K.L.Q.]'s substance use did not impact Dr. Tilley's expert opinion that [K.L.Q.] did not know the wrongfulness of the acts charged.

{¶ 32} Further, the state would have had ample opportunity to challenge Dr. Tilley's testimony through cross-examination and through Dr. White's own testimony, which it would present in rebuttal. Instead, however, the state sought to offer Dr. White's speculative opinion that [K.L.Q.]'s symptoms might have been the result of voluntary intoxication, while precluding Dr. Tilley from responding to that opinion and from explaining why he did not consider voluntary intoxication as contributing to his own medical opinion. This is directly contrary to the purposes of Crim.R. 16(K), as set out by the Supreme Court of Ohio in *Boaston*, to put the parties on equal footing with respect to expert testimony.

{¶ 33} The impact of the trial court's ruling on [K.L.Q.]'s ability to present a complete defense is especially glaring given the order in which the evidence concerning [K.L.Q.]'s NGRI defense was presented. The defense presented its evidence in support of [K.L.Q.]'s NGRI defense at the first opportunity, after the state had completed its case-in-chief, at a time when the state had not yet introduced any evidence regarding [K.L.Q.]'s mental condition. The state did not present Dr. White's opinion until its rebuttal case, after Dr. Tilley had testified.

{¶ 34} Dr. White admitted she had no information to support an opinion that [K.L.Q.] was under the influence of drugs at the time of the charged conduct. The police did not perform field sobriety tests, nor did they order any toxicology screening on [K.L.Q.]. No illegal drugs or drug paraphernalia were found in [K.L.Q.]'s vehicle or on his person, and [K.L.Q.] told the officers, as he told both Dr. Tilley and Dr. White, that he was not on any substances at the time of the charged offenses. Dr. White acknowledged that no police officer had indicated in police reports or in the video evidence that [K.L.Q.] was under the influence of drugs or alcohol, and no witness testified that [K.L.Q.] had taken any impairing drugs in the days preceding the charged offenses. Nevertheless, she opined that [K.L.Q.]'s

psychotic symptoms *might* have stemmed from substance use rather than from a severe mental illness.

{¶ 35} The defense did not have an opportunity to recall Dr. Tilley or to present additional evidence in response to Dr. White's testimony. Its only opportunity to respond to Dr. White's opinion was during its case-in-chief, before Dr. White testified. The trial court's ruling denied Dr. Tilley the opportunity to explain why [K.L.Q.]'s history of substance use did not affect his conclusion, stated in his written expert reports and shared with the state, that [K.L.Q.] was suffering from a severe mental disease at the time of the alleged offenses. In so ruling, the trial court denied the defense a meaningful opportunity to offer its take on a critical question and likely left the jury with the erroneous impression that the defense had no response to Dr. White's supposition regarding substance use. Allowing the state to introduce unrebuttable and highly prejudicial testimony that bore at best an attenuated connection to the evidence, we conclude that the trial court abused its discretion in sustaining the state's objection and imposing a complete prohibition of any testimony from Dr. Tilley touching on substance use.

{¶ 36} For these reasons, we sustain [K.L.Q.]'s first assignment of error.

**B. Second assignment of error**

{¶ 37} In his second assignment of error, [K.L.Q.] argues that his convictions are contrary to the manifest weight of the evidence, which he contends demonstrated he was legally insane at the time of the offenses.

{¶ 38} A manifest-weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Magan*, 2026-Ohio-1466, ¶ 26 (10th Dist.). " '[W]eight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other.' " *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When deciding a manifest-weight challenge, "an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State*

*v. Slaughter*, 2026-Ohio-1291, ¶ 19 (10th Dist.), citing *Thompkins* at 387. Reversal of a judgment as being against the manifest weight of the evidence should occur only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 39} "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas*, 70 Ohio St.2d 79 (1982), at the syllabus. In conducting a manifest-weight review, "we are guided by the presumption that the jury ' "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Slaughter* at ¶ 20, quoting *State v. Cattledge*, 2010-Ohio-4953, ¶ 6 (10th Dist.), quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The jury is entitled to believe " 'all, part, or none of the testimony of each witness appearing before it,' " *id.*, quoting *Cattledge* at ¶ 6, and "we afford great deference to the jury's determination of witness credibility," *id.*, citing *State v. Redman*, 2011-Ohio-1894, ¶ 26 (10th Dist.).

{¶ 40} A person is NGRI if "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). NGRI is an affirmative defense, which the defendant bears the burden of establishing by a preponderance of the evidence. *See State v. Tibbetts*, 2001-Ohio-132; R.C. 2901.05(A). [K.L.Q.] argues that this court must reverse his convictions because the manifest weight of the evidence established he was legally insane at the time of the charged offenses. Based on the evidence presented to the jury, we disagree.

{¶ 41} The jury was presented with competing opinions from qualified experts as to whether [K.L.Q.] was suffering from a severe mental disease at the time of the charged offenses that caused him to not know the wrongfulness of his acts. As already discussed, Dr. Tilley opined that [K.L.Q.] was symptomatic with a severe mental disease and did not know the wrongfulness of his actions at the time of the charged offenses. Dr. White, on the other hand, opined that she could not rule out that [K.L.Q.]'s symptoms were the result of substance use rather than a severed mental disease. In any event, she opined that [K.L.Q.] was aware of the wrongfulness of his actions at the time of the charged offenses.

{¶ 42} When a jury is presented with expert witnesses who offer differing opinions regarding an NGRI defense, it must make a credibility determination and decide which expert to believe. *State v. Russell*, 2025-Ohio-2613, ¶ 31 (2d Dist.), citing *State v. Petrie*, 2016-Ohio-4941, ¶ 5 (9th Dist.), citing *State v. Murphy*, 2016-Ohio-1165, ¶ 39 (4th Dist.). Having viewed the testimony of both expert witnesses and considered their written reports in connection with the other evidence presented, the jury was entitled to assign credibility to Dr. Tilley's and Dr. White's opinions as it saw fit. The jury could reasonably have believed Dr. White's testimony that [K.L.Q.]'s undisputed mental-health symptoms, including his delusional beliefs and auditory and visual hallucinations, were not the result of a serious mental disease, especially in light of the trial court's erroneous ruling prohibiting Dr. Tilley from responding to Dr. White's opinion that those symptoms may have resulted from substance use. The jury also could reasonably have believed Dr. White's testimony that, even if those symptoms were the result of a serious mental disease, [K.L.Q.] nevertheless knew the wrongfulness of his conduct. On this record, we simply cannot conclude that the jury lost its way in believing Dr. White's testimony over Dr. Tilley's testimony.[1] Because this is not an extraordinary case in which the evidence weighs heavily against the convictions, we overrule [K.L.Q.]'s second assignment of error.

## IV. CONCLUSION

{¶ 43} For these reasons, we sustain [K.L.Q.]'s first assignment of error and overrule [K.L.Q.]'s second assignment of error. Having determined that the trial court prejudicially erred by precluding Dr. Tilley from testifying regarding the effect or lack thereof of [K.L.Q.]'s substance use on his expert opinion that [K.L.Q.] was legally insane at the time of the charged offenses, we reverse the judgment of the Franklin County Court of Common Pleas, and remand this matter to that court for further proceedings consistent with this decision and the law.

*Judgment reversed;*
*cause remanded.*

DORRIAN and MENTEL, JJ., concur.

———————

[1] Our opinion regarding the manifest weight of the evidence is confined solely to the record currently before us; we offer no opinion regarding the manifest weight of evidence that may be presented on remand.